## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MICHAEL K. BLACKBURN,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00001 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   Pamela Meade Sargent |
| Defendant. | ) | United States Magistrate Judge |

### I.  Background and Standard of Review

The plaintiff, Michael K. Blackburn, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Blackburn protectively filed his application for DIB on May 6, 2004, alleging disability as of February 23, 2004, based on diabetes, chronic obstructive pulmonary disease, anxiety, depression, an injured sternum, chronic back and leg pain, right knee problems, impaired vision, high cholesterol, osteochondritis, degenerative bone disease and bulging disc. (Record, ("R."), at 72-75, 136-37.) The claim was denied initially and upon reconsideration. (R. at 58-60, 63, 64-66.) Blackburn then requested a hearing before an administrative law judge, ("ALJ"). (R. at 67.) The ALJ held a hearing on May 2, 2006, at which Blackburn was represented by counsel. (R. at 30-50.)

By decision dated August 24, 2006, the ALJ denied Blackburn's claim. (R. at 16-27.) The ALJ found that Blackburn met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 18.) The ALJ also found that Blackburn had not engaged in substantial gainful activity since February 23, 2004.[1] (R. at 18.) The ALJ found that the medical evidence established that Blackburn suffered from severe impairments, namely musculoskeletal problems, diabetes, anxiety and depression, but he found that Blackburn did not have an

---

[1]Blackburn's alleged date of disability was February 23, 2004, and his date last insured was December 31, 2008. Therefore, the relevant time period is February 23, 2004, through December 31, 2008.

impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ also found that Blackburn had the residual functional capacity to perform simple, low-stress, light work,[2] that allowed frequent postural changes, that did not require him to stand and/or walk continuously for more than an hour, that did not require more than occasional kneeling, squatting and crawling and that did not involve working with the public. (R. at 19.) Therefore, the ALJ found that Blackburn was unable to perform any of his past relevant work. (R. at 25.) Based on Blackburn's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Blackburn could perform, including those of a houseman, a hand packager, a grader/sorter, a production machine tender, an assembly worker and a laborer. (R. at 25-26.) Thus, the ALJ found that Blackburn was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 26-27.) *See* 20 C.F.R. § 404.1520(g) (2009).

After the ALJ issued his decision, Blackburn pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 5-10.) Blackburn then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2009). This case is before the court on Blackburn's motion for summary judgment filed July 8, 2009, and on the Commissioner's motion for summary judgment filed September 23, 2009.

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2009).

## II. Facts

Blackburn was born in 1962, which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 33, 72.) Blackburn obtained his general equivalency development, ("GED"), diploma, and he has a commercial driver's license. (R. at 45-46, 91.) He has past relevant work experience as a truck driver. (R. at 34, 82, 103.) Blackburn testified that he sustained injuries in a work-related tractor-trailer accident on February 23, 2004. (R. at 33.) He stated that he injured his back, right knee and sternum and bruised his heart. (R. at 33.) He stated that he was disabled due to chronic pain and diabetes. (R. at 34.) Blackburn stated that he had been diagnosed with obsessive compulsive disorder. (R. at 37.) He stated that he obsessed about getting germs, which kept him from wanting to be around people. (R. at 37.) Blackburn stated that it had been four months since he last consumed alcohol. (R. at 43.) He stated that his psychotic medications had him "pretty well controlled." (R. at 44.)

Robert Spangler, a vocational expert, was present and testified at Blackburn's hearing. (R. at 46-49.) Spangler classified Blackburn's past work as a truck driver as semiskilled, medium[3] work. (R. at 46.) Spangler was asked to consider an individual of Blackburn's age, education and past work experience who had the residual functional capacity to perform light work that would allow frequent postural changes and that did not require more than occasional kneeling, squatting and crawling. (R. at 46-47.) Spangler stated that there would be roughly 22,800 jobs available that such an individual could perform, including jobs as a cashier, an interviewer, an

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2009).

information clerk, a record clerk, a factory messenger, an inventory clerk and a general office clerk. (R. at 47.) Spangler was asked to consider the same individual, but who would be limited to simple, low-stress jobs that would not require him to work with the public. (R. at 47-48.) He stated that there was a significant number of jobs available that such an individual could perform, including jobs as a mail maid, a hand packer, a grader, a sorter, a nonconstruction laborer, a production machine tender, an assembler and a production inspector. (R. at 48.) He stated that there was 3,600 of the above mentioned jobs available in the region. (R. at 48.) Spangler was asked to assume the same individual, but who would have a greater than moderate impairment in his ability to maintain routines and to deal with stress. (R. at 48.) He stated that there would be no jobs available that such an individual could perform. (R. at 49.)

In rendering his decision, the ALJ reviewed medical records from Norton Community Hospital; Dr. Kadomath Boodron, M.D.; Dr. Jim C. Brasfield, M.D., a neurologist; Dr. Kenneth D. Kiser, M.D., a family practitioner; Dr. William McIlwain, M.D., an orthopedic surgeon; Dr. John Marshall, M.D., a pain specialist; Veterans Administration Medical Center; Dr. Marie Ann Stemple, M.D., an internist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Lawrence Wallace, M.D., an orthopedic surgeon; and Wise County Schools.

The record shows that Blackburn was seen by Dr. Kadomath Boodron, M.D., from July 2003 through April 2004 for complaints of low back pain, knee pain, swelling of his feet and legs, depression, anxiety, diabetes mellitus and Peyronie's

disease.[4] (R. 179-90.)

On February 23, 2004, Blackburn was involved in a truck driving accident. (R. at 191-93.) He was hospitalized at Norton Community Hospital for four days. (R. at 191-232.) He underwent a CT scan and x-rays of his chest, cervical spine, pelvis and right lower extremity, which were negative for fractures. (R. at 191, 202-12.) An MRI of Blackburn's back showed mild foraminal stenosis at the L3-L4 level and mild degenerative disc disease without focal herniation or significant central canal stenosis at the L1-L2 and L2-L3 levels. (R. at 191, 200.) Blackburn was diagnosed with contusions to his right chest wall and right lateral abdominal wall and mild L3-L4 foraminal stenosis. (R. at 191, 200.) He also had mild degenerative disc disease at the L4-L5 and L5-S1 levels, without focal disc herniation or significant central canal stenosis. (R. at 200.)

On March 11, 2004, Dr. Lawrence Wallace, M.D., an orthopedic surgeon, examined Blackburn for his complaints of low back pain. (R. at 233-34.) Blackburn was able to extend without difficulty. (R. at 233.) He had normal range of motion and strength in his hips, knees and ankles. (R. at 233.) Dr. Wallace diagnosed muscular strain/sprain. (R. at 233.)

Blackburn followed up treatment with several physicians, including Dr. Jim C. Brasfield, M.D., a neurologist, (R. at 252-53, 257-58, 262-64, 270-74); Dr. Kenneth D. Kiser, M.D., a family practitioner, (R. at 280-88); Dr. William McIlwain, M.D.,

---

[4]Peyronie's disease involves an abnormal hardening of the corpora cavernosa of the penis. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 487 (28th ed. 1994.)

an orthopedic surgeon, (R. at 245, 247-51, 254-56, 260-61); and Dr. John Marshall, M.D., a pain specialist. (R. at 240-44.) Blackburn also received treatment from multiple physicians at the Veterans Administration Medical Center, ("VAMC"), (R. at 150-55, 432-51, 534-36), and Dr. Marie Ann Stemple, M.D., an internist, for complaints of chronic pain, ongoing uncontrolled diabetes and depression/anxiety. (R. at 492-519, 525-30.)

On May 20, 2004, Dr. Brasfield opined that Blackburn's injury caused, at most, a lumbar strain without any neurological deficits. (R. at 257.) He opined in June 2004 that Blackburn needed to either undergo some lumbar rehabilitation and/or return to his full-time work. (R. at 253.)

In May 2004, Dr. McIlwain performed arthroscopic surgery on Blackburn's right knee. (R. at 315-17.) He opined in August 2004 that even though Blackburn might not meet all of the requirements of a truck driver, he could work within the limits of his functional capacity evaluation and be placed in a light-duty position that did not require sitting for more than two-thirds of an eight-hour workday, kneeling, squatting or crawling for more than one-third of the day and no walking on narrow elevated surfaces. (R. at 245, 247-48.) In June 2004, a venous study of Blackburn's lower extremities showed no evidence of superficial or deep thrombophlebitis. (R. at 277.) In September 2004, Dr. McIlwain reported that Blackburn walked and moved well. (R. at 245.) In February 2005, x-rays of Blackburn's right knee showed some degenerative changes. (R. at 303.) In March 2005, x-rays of Blackburn's right knee were normal. (R. at 302.)

On May 25, 2004, Dr. Kiser determined that Blackburn's chest pain was noncardiac in nature and that it was secondary to costochondritis. (R. at 285, 288.) Blackburn underwent a bone scan in May 2004, which was normal. (R. at 312.) A lumbar myelogram showed mild degenerative disc and joint changes and bilateral pars intraarticularis defects at the L5 level, and no signs of spondylolisthesis was noted. (R. at 309-10.)

On October 28, 2004, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Blackburn at the request of Disability Determination Services. (R. at 318-24.) Blackburn's affect was moderately depressed, and he described his mood as "down, depressed and bad." (R. at 321.) Blackburn reported that he did not like being around people and that he had a germ phobia. (R. at 321.) He showed no overt signs of disordered thought processes or delusional thinking, and he appeared rational and alert. (R. at 321.) Lanthorn noted that Blackburn was taking psychotropic medications for his anxiety and depression. (R. at 319.) Blackburn stated that his alcohol consumption had increased since his accident. (R. at 320-21.) Lanthorn diagnosed Blackburn with an adjustment disorder with mixed anxiety and depressed mood, dysthymic disorder, phobia of germs and alcohol abuse. (R. at 322.) He opined that Blackburn had a Global Assessment of Functioning[5] score, ("GAF"), of 60.[6] (R. at 322.) Lanthorn found that Blackburn could understand and remember and that his estimated intellectual functioning was average. (R. at 322.) He also could attend to

_____

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6]A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

tasks and concentrate for short periods of time. (R. at 322.) He reported that Blackburn would have some difficulty maintaining a routine and dealing with additional stress. (R. at 322-23.) Blackburn's social interaction skills and general adaptation skills were fair, and he also could set goals and make plans. (R. at 323.) Lanthorn reported that Blackburn appeared to be taking a significant amount of benzodiazepines and consuming alcohol. (R. at 323.)

On November 15, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Blackburn had the residual functional capacity to perform light work. (R. at 325-31.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 329-30.)

On November 16, 2004, Joseph Leizer, Ph.D., a state agency psychologist, indicated that Blackburn was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 333-36.) This assessment was affirmed E. Hugh Tenison, Ph.D., another state agency psychologist, on May 4, 2005. (R. at 335.)

Leizer also completed a Psychiatric Review Technic form, ("PRTF"), indicating that Blackburn suffered from an affective disorder, an anxiety-related disorder and a substance addiction disorder. (R. at 337-50.) Leizer indicated that Blackburn was

mildly limited in his ability to perform activities of daily living. (R. at 347.) He indicated that Blackburn was moderately limited in his ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 347.) Leizer indicated that Blackburn had not experienced any episodes of decompensation. (R. at 347.) This assessment was affirmed by Tenison on May 4, 2005. (R. at 337.)

In December 2004, Dr. Stemple began seeing Blackburn for regular check-ups and medication refills for both his physical and mental impairments. (R. at 518-19.) On March 4, 2005, Dr. Stemple reported her concern that Blackburn was actively suicidal. (R. at 450, 517.) She recommended that Blackburn be immediately hospitalized for observation and evaluation. (R. at 450, 517.) Blackburn was sent to the emergency room, but he was discharged that same night in an improved and stable condition. (R. at 482, 565-70.) He denied having any intention to hurt himself. (R. at 482.) Dr. Stemple continued treating Blackburn conservatively through March 2006 for uncontrolled diabetes and complaints of chronic pain in his neck and low back and complaints of pain and numbness in his upper and lower extremities. (R. at 492-516, 525-30.) Dr. Stemple reported that Blackburn's neck was supple and nontender with full range of motion. (R. at 493, 495, 498, 501, 506, 509, 526.) His back was tender across the lumbar area. (R. at 493, 496, 499, 501, 506, 510, 526.) Neurologically, Blackburn was positive for diabetic neuropathy, but moved all his extremities. (R. at 493, 496, 499, 502, 507, 510, 526.) He had a left upper extremity deformity with decreased range of motion of his left shoulder, but no edema, and his lower extremities revealed changes consistent with peripheral vascular disease. (R. at 493, 496, 499, 502, 507, 510, 527.) Dr. Stemple advised Blackburn to take his insulin and monitor his blood sugar regularly. (R. at 496, 499, 502, 507, 510, 527.)

In December 2005, Blackburn reported that he did "okay" with his depression and anxiety as long as he was taking his medications. (R. at 495-96.) On examination, Blackburn was smiling and talkative, cooperative, in a good mood and did not appear depressed or anxious. (R. at 496.) In January 2006, Blackburn complained of chronic pain and numbness in both legs. (R. at 492.) He stated that he was "trying not to drink alcohol." (R. at 492.) In February 2006, Dr. Stemple reported that even though Blackburn complained of increased stress due to family members moving in with him, he remained pleasant, cooperative, in no acute distress and did not appear depressed or anxious. (R. at 526-27.)

On March 4, 2005, Blackburn was seen at St. Mary's Hospital complaining of an anxiety attack. (R. at 566-69.) He stated that he had taken Xanax and Lortab and consumed four beers prior to presenting to the emergency room. (R. at 566.) He denied suicidal ideations. (R. at 568.) His mental status was deemed normal. (R. at 568.) He was diagnosed with depression. (R. at 569.)

In April 2005, Blackburn began seeking mental health treatment at the VAMC for anxiety and depression. (R. at 443-64.) It was reported that Blackburn was depressed, anxious, easily angered, fearful of germs and had poor attention and questionable judgment. (R. at 438, 443.) Blackburn was diagnosed with dysthymia, a mood disorder and an obsessive compulsive disorder. (R. at 445.) Blackburn's GAF score was assessed at 45.[7] (R. at 445.) In June 2005, Blackburn reported that he was "no better." (R. at 438.) His GAF score was assessed at 55. (R. at 438.) In July 2005,

---

[7]A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

Blackburn was "coping better," had improved concentration, was less angry, less anxious and had less obsessive compulsive disorder anxieties. (R. at 435.) Blackburn reported that he had "started a business," and his GAF score was assessed at 57. (R. at 435.) Blackburn was not seen again for another medication check-up until April 2006. (R. at 534.) At that time, Blackburn complained of increased anxiety and ongoing struggles with obsessive compulsive disorder. (R. at 534.) Blackburn was alert and oriented, his mood was dysthymic and his affect was restricted. (R. at 534.) His psychomotor activity was reported to be within normal range, his judgment and insight were adequate and he denied having any suicidal or homicidal ideations. (R. at 534.) Blackburn was assessed a GAF score of 55. (R. at 534.)

On August 5, 2005, Blackburn was admitted to the hospital for hypoglycemia, secondary to an accidental insulin overdose. (R. at 470-81, 560-64.) He was discharged the same day in stable condition. (R. at 470.) On December 8, 2005, he was hospitalized for treatment of diabetic ketoacidois. (R. at 465-69, 538-45.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds

conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 24, 2006, the ALJ denied Blackburn's claim. (R. at 16-27.) The ALJ found that the medical evidence established that Blackburn suffered from severe impairments, namely musculoskeletal problems, diabetes, anxiety and depression, but he found that Blackburn did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ also found that Blackburn had the residual functional capacity to perform simple, low-stress, light work, that allowed frequent postural changes, that did not require him to stand and/or walk continuously for more than an hour, that did not require more than occasional kneeling, squatting and crawling and that did not involve working with the public. (R. at 19.) Therefore, the ALJ found that Blackburn was unable to perform any of his past relevant work. (R. at 25.) Based on Blackburn's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs

existed in significant numbers in the national economy that Blackburn could perform, including those of a houseman, a hand packager, a grader/sorter, a production machine tender, an assembly worker and a laborer. (R. at 25.) Thus, the ALJ found that Blackburn was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 26-27.) *See* 20 C.F.R. § 404.1520(g).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In his brief, Blackburn argues that the ALJ erred by finding that a significant

number of jobs exist in the economy that he could perform. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 4-6.) Blackburn also argues that the ALJ erred by failing to address all the evidence and to indicate the weight given to such. (Plaintiff's Brief at 6.) In particular, Blackburn argues that the ALJ failed to evaluate the GAF score assessed at the VAMC, nor indicate the weight given to such. (Plaintiff's Brief at 6.)

The ALJ in this case found that Blackburn had the residual functional capacity to perform simple, low-stress, light work, that allowed frequent postural changes, that did not require him to stand and/or walk continuously for more than an hour, that did not require more than occasional kneeling, squatting and crawling and that did not involve working with the public. (R. at 19.) Based on my review of the record, this finding is supported by substantial evidence. The ALJ noted that none of Blackburn's physicians opined that his impairments caused limitations that precluded him from working. (R. at 22, 24-25.) Dr. Brasfield opined that Blackburn could return to full-time work activity only four months after his truck accident. (R. at 253.) He reported that he found no basis to prevent Blackburn from returning to full-time work. (R. at 253.) Similarly, Dr. McIlwain opined that, even if Blackburn could not return to work as a truck driver, he could perform light work that did not require him to sit for more than two-thirds of an eight-hour workday, that did not require kneeling, squatting or crawling more than one-third of an eight-hour workday and that did not require walking on narrow elevated surfaces. (R. at 245.) Blackburn's physicians believed Blackburn's diabetes could be better controlled by checking his blood sugars daily, using proper dosages of insulin and adhering to a diabetic diet. (R. at 283, 465, 496, 499, 502, 507, 510, 527, 534.)

The ALJ also noted that the evidence failed to show that Blackburn's treating mental health providers placed any work-related mental restrictions on him that precluded him from working. (R. at 25.) In October 2004, Lanthorn diagnosed Blackburn with an adjustment disorder with mixed anxiety and depressed mood, dysthymic disorder, phobia of germs and alcohol abuse. (R. at 322.) Lanthorn assessed a GAF score of 60. (R. at 322.) In April 2005, Blackburn's GAF score was assessed at 45. (R. at 445.) However, by June 2005, his GAF score was noted to be 55. (R. at 438.) In July 2005, Blackburn reported that he was coping better, had improved concentration, was less angry, less anxious and had less obsessive compulsive disorder anxieties. (R. at 435.) He reported that he had started a business. (R. at 435.) His GAF score was assessed at 57. (R. at 435.) In December 2005, Blackburn reported that his depressive and anxiety symptoms had improved with medication. (R. at 495-96.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). In February 2006, Blackburn was in a good mood, smiling, talkative, in no acute distress and not depressed or anxious. (R. at 526-27.) In April 2006, Blackburn's GAF score remained at 55. (R. at 534.) The ALJ noted that he gave greater weight to the opinions of Lanthorn and the state agency psychologist, who opined that Blackburn was capable of performing, simple, low-stress work with limited social interaction. (R. at 25.) Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the psychological evidence.

Blackburn further argues that substantial evidence does not exist to support the ALJ's finding that a significant number of jobs existed in the economy that he could perform. (Plaintiff's Brief at 4-6.) I find this argument is without merit. The vocational

expert testified that of the 114,000 light jobs in the region, only 3,600 jobs remained that allowed for Blackburn's mental limitations and postural and sit/stand option limitations. (R. at 47-48.) However, the ALJ mistakenly noted in his decision that there were 114,000 instead of 3,600 light jobs that Blackburn could perform. (R. at 26.) Blackburn argues that 3,600 jobs in the regional economy would not constitute a "significant" number of jobs as required by the regulations. The Court of Appeals for the Fourth Circuit, however, stated in *Hicks v. Califano*, 600 F.2d 1048,1051 n.2 (4th Cir. 1979), that 110 jobs would not constitute an insignificant number. In *Craigie v. Bowen*, 835 F.2d 56, 58 (3rd Cir. 1987), the Third Circuit also stated that 200 jobs in the region was a clear indication that there existed in the national economy other substantial gainful work which a claimant could perform. In this case, the vocational expert identified 3,600 jobs available in the region that Blackburn could perform, including jobs as a mail maid, a hand packer, a grader, a sorter, a nonconstruction laborer, a production machine tender, an assembler and a production inspector. (R. at 48.) Based on the above-stated cases, I reject Blackburn's argument on this issue.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's finding with regard to Blackburn's residual functional capacity;

3. Substantial evidence exists to support the ALJ's finding that a significant number of jobs exist in the economy that Blackburn could perform; and

4. Substantial evidence exists to support the ALJ's finding that Blackburn was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Blackburn's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      February 17, 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE